STATE OF FLORIDA et al., Plaintiffs-Appellants,

v.

Caspar W. WEINBERGER, Secretary, Health, Education and Welfare, Defendant-Appellee.

No. 73-1728.

United States Court of Appeals, Fifth Circuit.

April 10, 1974.

---

**490**

Robert L. Shevin, Atty. Gen., S. Strome Maxwell, Asst. Atty. Gen., Tallahassee, Fla., Eli H. Subin, Orlando, Fla., William A. Geoghegan, George D. Webster, Washington, D. C., William L. Rogers, Asst. Atty. Gen., Miami, Fla., for plaintiffs-appellants.

Stewart J. Carrouth, Asst. U. S. Atty., Tallahassee, Fla., Harlington Wood, Jr., Asst. Atty. Gen., Robert E. Kopp, Robert S. Greenspan, David Cohen, Civil Div., Appellate Section, U. S. Dept. of Justice, Washington, D. C., for defendant-appellee.

Before GODBOLD, DYER and GEE, Circuit Judges.

GEE, Circuit Judge:

The State of Florida, joined by its own licensing board for nursing home administrators and its members, as well as by various national and state associations of examiners, nursing homes and administrators, seeks a determination of the validity of a regulation promulgated by defendant, Caspar W. Weinberger, in his capacity as Secretary of the United States Department of Health, Education and Welfare. The regulation (45 C.F.R. § 252.10) redefines what sort of a state licensing board for nursing home administrators will qualify for the Medicaid program. The major revision of the original definition alters it so that a board containing a majority of nursing home administrators will no longer pass muster. Florida, having acted under the former definition, has such a board. Other provisions of the regulations are also attacked. The court below refused the injunctive and declaratory relief sought and, finding neither ripeness for review in the cause nor standing in any plaintiff, dismissed the case. Finding both, we reverse and remand for a determination of the merits.

## I.

### The Case and Its Posture

Medicaid is a program established by Congress under which participating states receive funds for use in providing medical assistance to the aged, blind, disabled and others under certain specified disadvantages. States such as Florida wishing to participate must secure the Secretary's approval of a medical assistance plan meeting the requirements of 42 U.S.C. § 1396a. Among these are providing an agency to license nursing home administrators, if such homes are to figure in the plan. Any omnibus agency established by state law to license the healing arts is to perform the function; if there is none, a board is to be created to do so which is ". . . representative of the professions and institutions concerned with care of chroni-

cally ill and infirm aged patients . . . ." 42 U.S.C. § 1396g(b). A brief chronology may be of assistance in understanding how the parties arrived at the posture in which we find them.

Prior to the issuance of regulations by the Secretary relating to the requirements for such boards, his official position regarding their composition was contained in a letter of January 29, 1970, reading in part as follows:

> The Department of Health, Education and Welfare . . . would not object to a State board consisting of a simple majority of members representing one group, provided the remainder of the board membership is representative of the other professions and institutions concerned with the care of nursing home patients. As an example, a nine-man board might consist of five nursing home administrators, with the remaining four members representative of such other professions as the medical, nursing, hospital administrators, or educators in the health disciplines.

On February 28, 1970, interim regulations were published by the Secretary which tracked the statutory language without significant change.

Effective July 7, 1970, Florida passed its statute governing the composition of its board, establishing an 11-member board consisting of six licensed nursing home administrators and five other members drawn from the ranks of other germane callings. Florida Statutes § 468.166, F.S.A.

On September 9, 1971, the Secretary proposed a regulation adding to the definition of the term "board" as used in his regulation the following language:

> . . . provided that less than a majority of the board membership shall be representative of a single profession or institutional category, and

provided further that the non-institutional members shall have no direct financial interest in nursing homes.

On March 29, 1972, this regulation was adopted as a final one. It became effective on July 1, 1973.

Thus, at this time, Florida law *requires* a majority of nursing home administrators on its licensing board, and the Secretary's regulation *forbids* one.

Joined by various professional groups, Florida brought suit asserting that the amended regulation exceeded the Secretary's powers in this and other respects and seeking declaratory and injunctive relief. Jurisdiction was alleged under federal question, declaratory judgment and administrative procedure act heads. The Secretary sought dismissal of the action for failure to state a claim upon which relief could be granted, lack of personal and subject matter jurisdiction, and want of standing to sue. Cross-motions for summary judgment were filed and plaintiffs' application for injunction *pendente lite* was noticed. Upon hearing the court denied the relief requested by plaintiffs, granted defendant's motion for summary judgment and dismissed the complaint on grounds of want of standing in any plaintiff save Florida,[1] lack of ripeness of the controversy for decision, and the existence of an adequate remedy at law.

Plaintiffs' appeal presents only the issues of standing and ripeness for review. The Secretary counters, treating these two issues under the general rubric of standing and asserting as well both sovereign immunity and the correctness of his position on the merits—that is, that the regulation is a valid exercise of his authority. Since our disposition does not reach the merits, we emphasize at the outset that nothing herein is intended as intimating any views whatever upon them.

---

1. We read the order below as finding standing to sue on the part of Florida, though the court's opinion entwines this question with that of ripeness for review in such a manner as to render its decision of this issue unclear.

## II.

### Ripeness for Review

■ The standards which must guide our decision of this issue are provided by Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and the companion cases of Toilet Goods Association v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), and Gardner v. Toilet Goods Association 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). They are succinctly stated in the Abbott majority opinion, at 387 U.S. 148–149:

> Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

■ The basic rationale stated by Mr. Justice Harlan seems amply fulfilled here. There is nothing abstract about this disagreement, and the Secretary has set a collision course with Florida law in a formal and final regulation which is backed by grave sanctions and which demands, if valid, immediate compliance.[2]

As for the Court's specific, two-pronged test, the issue posed on the merits is a classic one for judicial treatment: whether particular regulations promulgated by the Secretary are within his authority. As in Abbott, both sides have moved for summary judgment, and no claim is made that further adminis-

trative proceedings are contemplated. And as in Abbott, the Secretary's full-dress argument to us on the merits of the regulation's validity proceeds entirely in terms of congressional intent and makes little or no appeal to factual justifications. The regulation is final and is formally and actually in effect. Indeed, the Secretary seems obliquely to concede fitness of the issue for judicial decision by quoting the Abbott test in both its aspects but disputing only its hardship facet.

As for that hardship, the state is presently faced with the dilemma whether to bow to the Secretary's volte-face and amend its laws and procedures, with all the likely financial outlay and certain legislative and administrative effort which that process entails, or to risk the at least temporary loss of funding which a conformity hearing by the Secretary could well produce. Indeed, only the holding of such a hearing stands between Florida and these consequences as we write. In the process of enacting his regulation, the Secretary has already necessarily determined that it complies with the Act, and if it does, plainly Florida law does not. One consequence of such a finding by him in a conformity hearing is an immediate and mandatory termination of funding, either of the non-conforming portion of Florida's plan or, in the Secretary's discretion, of the entire Florida Medicaid program. 42 U.S.C. § 1396c. The calamitous prospect of such a loss of funding, even for a short period, to the state and to the disadvantaged citizens for whom it stands parens patriae is so grave as to suffice for such hardship as may be required. Faced with the serious risk of such sanctions, there is no need for Florida to stand by while the Secretary ticks, hoping that he will not go off.

A similar situation was dealt with by the Supreme Court in Columbia Broadcasting System v. United States, 316 U. S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563

---

2. Under the regulations, for example, two of the plaintiffs here presently hold their posi- tions on the board illegally, as will appear more fully later in our opinion.

(1942), a suit under the Urgent Deficiencies Act, 38 Stat. 219. Held reviewable was a Federal Communications Commission regulation proscribing certain contractual arrangements between chain broadcasters and local stations. The regulations sought to be reviewed merely advised that stations maintaining such network contracts would not be licensed, though the FCC had no authority to regulate such contracts directly. At a time when no license had been denied or revoked, the Supreme Court held:

> The regulations are not any the less reviewable because their promulgation did not operate of their own force to deny or cancel a license. It is enough that failure to comply with them penalizes licensees, and appellant, with whom they contract. If an administrative order has that effect it is reviewable and it does not cease to be so merely because it is not certain whether the Commission will institute proceedings to enforce the penalty incurred under its regulations for noncompliance.

316 U.S. at pages 417–418.

See also Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L. Ed. 910 (1956), and United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).

As in *Abbott, supra,* the Secretary's regulations constitute an authoritative interpretation of a statutory provision governing the composition of Florida's nursing home administrator licensing board, one which the state ignores at its peril. The Secretary points out that, in the event of a conformity hearing and an adverse ruling, an application to this Court to stay the enforcement of his order can be made by the state. There is, however, no guarantee that such a stay would issue and, should one issue and Florida nevertheless lose its appeal, the stay would presumably be dissolved and an unseemly legislative scramble precipitated. We are unable to see the reason, especially where the confrontation has been the result of the Secretary's adoption of a regulation at variance with his former policy upon which the state presumably relied in constructing its statutory agency, in placing the sovereign state of Florida at such risk when so little would be gained by doing so and so much might be lost. The lines are drawn, the positions taken, and the matter is ripe for judicial review.

### III.

#### Standing

The basic concept of standing to invoke the judicial process is epitomized in Mr. Justice Brennan's concurring opinion in Association of Data Processing Service Organizations, Inc. v. Camp and Barlow v. Collins,[3] where he wrote:

> Although Flast v. Cohen, [392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947] was not a case challenging agency action, its determination of the basis for standing should resolve that question for all cases. We there confirmed what we said in Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L. Ed.2d 663 (1962), that the "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult * * * questions." "In other words," we said in *Flast,* "when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue" and not whether the controversy is otherwise justiciable, or whether, on the merits, the plaintiff has a legally protected interest that the defendant's action invaded. 392 U.S., at 99–100, 88 S.Ct. 1942, 1952–1953, 20 L.Ed.2d 947.

3. 397 U.S. 150, 99 S.Ct. 827, 25 L.Ed.2d 184 and 397 U.S. 159, 170–171, 90 S.Ct. 832, 840, 25 L.Ed.2d 192 (1970).

The objectives of the Article III standing requirement are simple: the avoidance of any use of a "federal court as a forum [for the airing of] generalized grievances about the conduct of government," and the creation of a judicial context in which "the questions will be framed with the necessary specificity, * * * the issues * * * contested with necessary adverseness and * * * the litigation * * * pursued with the necessary vigor to assure that the * * * challenge will be made in a form traditionally thought to be capable of judicial resolution." *Id.*, at 106, 88 S.Ct. at 1955–1956. Thus, as we held in *Flast*, "the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."

■ It seems clear that, considerations of ripeness and sovereign immunity aside, the State of Florida has standing, arising from its clear interest both in the manner in which the Medicaid program is administered vis-a-vis its citizens and in being spared the reconstitution of its statutory program, to litigate the merits of this case. Indeed, it is very doubtful that the court below found otherwise. We hold that Florida has standing. As to the other categories of plaintiffs presented by the record, the matter is more dubious; and, in view of the remand which we order, it becomes necessary for us to consider each to determine his standing or want thereof at a trial of the merits.

■ From Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), we learn that standing such as the non-state plaintiffs herein assert under Section 10 of the Administrative Procedure Act exists only in those who

allege that the Secretary's regulation, if upheld, will cause them an injury in fact, and that the injury, moreover, will be to an interest arguably within the zone of interests to be protected or regulated by the statute which the Secretary's regulation authoritatively interprets. By Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), we are cautioned that a mere special concern with the purposes of the statute, no matter how devout or long-maintained, will not suffice; an interest, economic or otherwise, must be alleged to be at stake. Finally, from United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973),[4] we learn that this interest, if genuine, may be small—no more than "an identifiable trifle." We add, from a consideration of the above authorities and others, that injury to the interest must, in the event of a decision adverse to the position of the party asserting standing, be not conjectural or speculative, but certain.

■ Applying these tests to the non-state plaintiffs who are before us on this appeal produces the conclusion that all have standing except plaintiffs Mary R. Tracy, William R. Stinger, M. D., the Florida Nursing Home Association and the American Nursing Home Association.

The Florida licensing board itself appears to have alleged a proper concern with statutes governing its own composition and an interest of a substantial nature in the continuation in office of two of its present members who are clearly disqualified by the Secretary's regulation. (In so stating, here and hereinafter, we use the term "concern" as a shorthand rendition of the presence of an interest advanced by a party which is arguably within the zone of interest to be regulated or protected by the statute under consideration.)

The nursing home administrator members of the board likewise plead such a.

4. Handed down after the decision below, so that the court below had benefit neither of its language nor its thrust.

proper concern, and each has alleged a sufficient interest at stake in that one among them will necessarily lose his seat on the board if the regulation is upheld. Which one cannot now be known.

The remaining plaintiffs have each alleged a proper concern with the interpretation of the statute in the sense stated, and all but the four noted above have likewise alleged at least a small but genuine interest at stake. One of the other board members, Lois Knowles, R. N., presents herself as a non-institutional board member having a direct financial interest in a nursing home. As such, she is affected by the portion of the regulation which disqualifies such persons for board membership. The other two board members, however, one a physician alleging no direct interest in such a home, and the other a member of the public at large alleging no such interest, will not be disqualified by the upholding of the Secretary's regulation and have no direct interest at stake.

The remaining plaintiffs are all associations of one kind or another.

The National Association of Boards of Examiners for Nursing Home Administrators, on the principle of *SCRAP* and Sierra Club v. Morton that associations may participate in defending the interests of their members, derives standing from that found above in the Florida board which, on a liberal construction of the pleadings, is alleged to be a member of that association.

■ The Florida Nursing Home Association, an association of Florida nursing homes, and the American Nursing Home Association, the parallel national association, have alleged no discernible interest at stake, however proper their concern may be with the qualifications of the administrators in their field. They come closest to doing so in attacking the portion of the regulation which permits provisional licensing of administrators who do not meet all qualifications, apparently a mild species of grandfather clause; however, in our view, they fail even in this, since the homes which they represent are not required to hire any such provisionally licensed administrator. It may be that a basis for standing in these groups is intimated by the complaint's allegations that the regulations improperly exempt from hiring licensed administrators those nursing homes which are separate and distinct parts of hospitals, but in the present state of the pleadings no allegations designate or particularize any interest in the nursing homes not exempted which is injured by this distinction.

■ The American College of Nursing Home Administrators, however, stands upon sounder, if somewhat slender, footing. Its members, together with the present members of the Florida board who are nursing home administrators, appear to us to have alleged standing derived from an interest in not being required to admit into the profession (and perforce compete with) persons provisionally licensed under the regulation mentioned next above, who are characterized as "unqualified." They also assert standing grounded in the loss of public respect for their members' profession which will be occasioned by a determination, such as the Secretary has made in the principal regulation attacked, that the nursing home administrators' profession is not of such a status as to be trusted to regulate the licensing of its own members by a majority on its licensing board. This is a faint and tenuous interest; however, obedient to our apprehension of the *SCRAP* opinion, *supra,* we are convinced that, if real, it is at least "an identifiable trifle." Nor can we say that the dignity of a decisive degree of self-regulation of any aspect of a profession is one of no value to its members, either as a matter of fact or of prestige.

If these be thought gossamer distinctions, we can only rejoin that *SCRAP's* ingenious law students have caused us to be translated to ethereal realms, where we must function as best we are able.

The Secretary perfunctorily advances sovereign immunity. To this contention a sufficient answer is that the complaint contains the classic allegations of action beyond the minister's delegated powers and that these, should plaintiffs prevail on the merits, must perforce be established since his regulations are challenged on no other ground.

Reversed and remanded.