**STATE OF LOUISIANA, Plaintiff,**

**Texaco, Inc., The Louisiana Land and Exploration Company, Intervening Plaintiffs,**

v.

**DEPARTMENT OF ENERGY and Charles W. Duncan, Jr., Secretary of Energy, Defendants.**

Civ. A. No. 800812.

United States District Court, W. D. Louisiana, Lafayette-Opelousas Division.

Feb. 20, 1981.

Camp, Carmouche, Palmer, Barsh & Hunter, Harry E. Barsh and David R. Frohn, Lake Charles, La., Morris, Nichols, Arsht & Tunnell, Andrew B. Kirkpatrick, Jr., Lawrence A. Hammermesh and Wm. O. LaMotte, Wilmington, Del., Fredrick W. Veters, New Orleans, La., Stephen H. Bard, White Plains, N. Y., for Texaco.

Bracewell & Patterson, John R. Cope, Roger L. Reynolds and Darci L. Rock, Washington, D. C., Milling, Benson, Woodward, Hillyer, Pierson & Miller, J. Henry Phillips, III, New Orleans, La., for La. Land & Exploration Co.

Allan Tuttle, Patton, Boggs & Blow, Washington, D. C., for State of La.

J. Ransdell Keene, Frances O. Allen, Shreveport, La., Dennis G. Linder, Branch Director, Michael T. Scott, Civ. Div., Dept. of Justice, Nancy Crisman and Judith Mather, Regulatory Litigation Div., David R. Hughes, Dept. of Sp. Counsel, Washington, D. C., for Dept. of Energy.

## MEMORANDUM OPINION

SHAW, District Judge.

Originally, plaintiff, State of Louisiana, petitioned this Court to declare that oil and gas production units that are established and recognized by Louisiana's Office of Conservation ("LOC") constitute separate "properties" under federal oil and gas pricing regulations. Plaintiff further requested this Court to enjoin defendants, the Department of Energy and Charles W. Duncan, Jr., Secretary of Energy, ("DOE"),[1]

---

1. As used herein, "DOE" will sometimes refer to the Department of Energy and its predecessor agencies, including the Federal Energy Administration ("FEA") and the Federal Energy Office ("FEO"), collectively, as well as to defendant, Charles W. Duncan, Jr., Secretary of

from proceeding administratively or judicially against producers of oil within the State on the erroneous theory that such units are not separate "properties".

On January 30, 1981, plaintiff filed an amended complaint, waiving its broader claim that all LOC units constitute separate "properties" and requested that the Court declare: (1) that at all times since August, 1973, reservoir-wide producing units established and recognized by Louisiana have been separate "properties" for the purpose of federal oil and gas pricing regulations; (2) that Louisiana and producers could properly have treated such units as "properties"; (3) that certain federal rulings, to the extent they purport to preclude the designation of reservoir-wide production units established by Louisiana as separate properties, are invalid, null and void, or alternatively, are not the only valid interpretation of the definition of property and therefore, cannot be applied retroactively; and, (4) for costs and various injunctive relief.

DOE, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, has moved to dismiss the complaints filed herein by the State of Louisiana on the grounds that this Court lacks jurisdiction because:

1. The plaintiff lacks standing to maintain this action;

2. The claims asserted in the complaint are not ripe for judicial review and do not present a justiciable case or controversy; and,

3. The plaintiff has failed to exhaust its administrative remedies.

DOE also moved this Court to vacate its orders granting Texaco, Inc. ("Texaco") and the Louisiana Land and Exploration Company ("LL&E") permission to intervene on the ground that the Court lacks jurisdiction under Rule 24(a) of the Federal Rules of Civil Procedure.

Energy. On February 4, 1981, James B. Edwards, Secretary of Energy, and successor in office to Charles W. Duncan, Jr., was substituted as defendant in place of Charles W. Duncan.

*Background Facts*

On July 19, 1973, the Cost of Living Council ("CLC") proposed a "two-tier" pricing system for crude oil to become effective on August 19, 1973.

The two-tier system was designed to achieve two goals simultaneously. It was to control inflation by limiting the price of oil then being produced to an established "ceiling price". At the same time, it would stimulate increased production by allowing newly discovered crude oil to be sold at a higher free-market price.

Basically, the two-tier system requires producers to determine, on a property-by-property basis, the portion of their crude oil production that must be sold at the lower tier price, and the portion eligible to be sold at the upper tier price. These determinations are made by comparing each property's current monthly production with the property's historic monthly production, designated as the "Base Production Control Level" ("BPCL"). The portion of current production from each property equal to, or less than, the BPCL must be sold at the lower tier ceiling price, and that portion that exceeds the BPCL may be sold at the upper tier ceiling price.

Therefore, oil produced from currently producing "properties" was "old oil" subject to the ceiling price. Increased production from existing "properties" and production from newly-discovered "properties" could be sold at a higher, uncontrolled price. The basic building block of the two-tier system was the "property" concept. In its August, 1973 notice, CLC defined "property" as follows:

> "Property" is the right which arises from a lease or from a fee interest to produce domestic crude petroleum. (38 Fed.Reg. 22536, 22538 (August 22, 1973))

That definition was codified at 6 C.F.R. § 150.354.

Numerous producers, including the intervenors in this case, construed this regulation to permit them to treat their various LOC units as separate "properties".[2]

2. It is the contention of plaintiff and intervenors herein that a crude oil producer, following the promulgation of the original property definition in 1973, could have reasonably and lawfully interpreted the definition of property at 10

DOE, however, remained silent as to the interpretation and application of that most basic concept for almost two years. Its first elaboration of the definition occurred in FEA Ruling 1975–15 announced on August 29, 1975. That ruling indicated that FEA, the predecessor of DOE, considered the "right to produce" to be the core concept of the "property" definition:

> For purposes of the price regulations then, the property concept is one that identifies the right to produce crude oil, whether that right arises from a lease or from a fee interest. (40 Fed.Reg. 40832 (September 4, 1975))

On April 13, 1976, FEA issued a notice of proposed rulemaking designed, among other things, to clarify the "property" concept further. In this notice, FEA proposed to elaborate Ruling 1975–15's recognition "that the lease or fee interest does not in every instance suffice to describe the producing entity, and, therefore, may not be adequate to describe the property." 41 Fed.Reg. 16179, 16180 (April 16, 1976) FEA observed that:

> (W)hen the right to produce crude oil, although arising from several lease or fee interests, is more correctly described by the unit, it is appropriate for the FEA to recognize the same producing entity as the property for purposes of determining lower and upper tier quantities.

FEA acknowledged the desirability of conforming its "property" definition to historical state regulatory concepts:

> (T)he pre-existing regulatory concepts, of state regulatory agencies and historical systems of production accounting that transcend the variations among state regulatory requirements ought to be afforded the maximum practicable significance under FEA regulations. (Id.)

It noted that these historical practices would modify a right to produce:

> C.F.R. § 212.72 to permit the designation as a separate "property" of any less-than-leasehold interest, where such property designation is based upon either:
> a. the recognition of an oil or gas production unit by the LOC;

Broadly stated, then, the right to produce crude oil may be described in the first instance by a lease or fee interest, but is subject to the possible further modification if some other producing entity has been recognized by the applicable state authority, which describes a different right to produce. (Id.)

FEA then gave particular recognition to Louisiana unitization procedures:

> For example, in Louisiana, where unitization may be compelled by the Commissioner of Conservation, the recognition by the state of producing entities is generally based upon factors other than merely surface boundaries. Such productive entities are called "units," although the term does not always denote the combination of separate lease or fee interests into the type of "unitization" described in Ruling 1975–15. It may, instead, indicate the recognition of the geological limits of a producing reservoir which lies entirely within the surface boundaries of a single lease. Such units may be formed in Louisiana as a result of a formal proceeding, and they then become separate producing entities recognized by the state. The balance of production from the non-unitized portion of the lease is then also recognized by the state as a producing entity. Accordingly, in Louisiana each state recognized unit may therefore appropriately describe a property, with each lease upon which is reported non-unitized production also appropriately describing a separate property.

> \*   \*   \*   \*   \*   \*

Accordingly, for purposes of FEA price regulations, the property concept may appropriately recognize such producing entities, as recognized by state bodies, whether the entity is the lease, some portion of the lease, or the unitization of parts of two or more leases. (Id.)

> b. the existence of separate and distinct pools or reservoirs within a lease or fee interest;
> c. the accounting for, and payment of, royalty fees; or,
> d. the calculation and payment of severance tax payments.

However, the FEA declined to adopt the regulatory changes proposed in April, and on August 20, 1976, FEA issued the rule which is the focus of this lawsuit. 41 Fed. Reg. 36172 (August 26, 1976). FEA added an additional provision to the "property" definition:

> "Property" means the right to produce domestic crude oil, which arises from a lease or from a fee interest. A producer may treat as a separate property each separate and distinct producing reservoir subject to the same right to produce crude oil, provided that such reservoir is recognized by the appropriate governmental authority as a producing formation that is separate and distinct from, and not in communication with, any other producing formation. (*Id.* at 36184)

The first sentence of this new definition merely repeated the CLC definition, as reworded, without substantive change, by FEA in February, 1976. The second sentence was to have prospective application from September 1, 1976, to permit producers prospectively to treat "as a separate property each separate and distinct producing reservoir subject to the same right to produce crude oil, provided such reservoir is recognized by the appropriate governmental regulatory authority as a producing formation that is separate and distinct from, and not in communication with, any other producing formation."

FEA discussed at some length its interpretation of the basic "property" definition and adopted the position that "property", as defined by CLC in 1973, and as reformulated in 1976,

> is generally to be understood as synonymous with the physical "tract" or "premises" as to which a working interest is established by an oil and gas lease, or by a fee interest. (*Id.* at 36174)

In so doing, the plaintiff claims that FEA abandoned its previously stated position that "property" could be defined by "rights to produce" other than the leasehold or fee interest (*e. g.*, LOC unitization orders).

Moreover, FEA concluded that:

> CLC, by its definition of the term "property" intended to refer to the premises described in the oil and gas lease pursuant to which crude oil was being produced. It also appears that this is the reasonable meaning of the definition that CLC used and that the definition should have been so understood. (*Id.*)

By imputing this intention to CLC, FEA held that "property" had *ab initio* meant the premises defined by a lease or fee interest.

On January 13, 1977, FEA issued Ruling 1977–1. 42 Fed.Reg. 3628 (January 19, 1977) It restated verbatim the "interpretive portions of the August 20 Notice", including its interpretation of the 1973 "property" definition and the clarifications thereto. *Id.* at 3629.

On January 19, 1977, FEA issued Ruling 1977–2. 42 Fed.Reg. 4409 (January 25, 1977) This ruling iterated the interpretation of Ruling 1977–1 that the "literal application" of the "property" definition was " 'premises described by an oil and gas lease.' " *Id.* at 4410.

On the basis of these rulings, DOE has instituted administrative enforcement proceedings against producers of oil in Louisiana, claiming that their treatment of LOC units as "properties" has resulted in over a billion dollars in overcharges.

The Office of Special Counsel ("OSC") initiated an audit of Texaco's domestically produced crude oil sales on August 1, 1977. On January 24, 1978, OSC issued a Notice of Probable Violation ("NOPV") to Texaco, which set forth the findings of the audit and identified particular instances where OSC had tentatively concluded that Texaco had sold domestically produced crude oil at prices in excess of the maximum lawful selling price. Certain of these instances were with respect to crude oil produced from properties in Louisiana.

The Proposed Remedial Order ("PRO")[3] issued to Texaco on May 1, 1979, alleged

---

**3.** If DOE determines that violation of its regulations has occurred, the next step is issuance of a Proposed Remedial Order ("PRO"), which must set forth the proposed findings of fact and conclusions of law upon which it is based. 10 C.F.R. §§ 205.192(a) and (d). If the PRO is contested by the recipient by filing a Notice of Objection, the matter proceeds to an adversary,

that Texaco has violated the price regulations applicable to the first sales of domestically produced crude oil and that for the period September, 1973, through March, 1979, the overcharges resulting from these violations amounted to not less than $748,801,210.00, plus interest. Louisiana claims that if it must repay all the taxes and royalties that it has collected on that alleged overcharge, its liability for that item alone could amount to $160 million. Texaco filed a timely Notice of Objection to the PRO. The ongoing administrative proceedings before the Office of Hearings and Appeals ("OHA") are currently in the discovery stage.

Following the institution of administrative proceedings against it for alleged overcharges, Texaco filed suit against DOE in the United States District Court for the District of Delaware on July 3, 1979.

Louisiana and LL&E were granted leave to intervene as of right in the Delaware action, under Rule 24(a) of the Federal Rules of Civil Procedure, by order of the Court.

On August 27, 1979, DOE moved to dismiss the action on the ground that the action was not ripe for pre-enforcement review and that the plaintiffs had not exhausted their administrative remedies.

On May 6, 1980, the Honorable Judge Walter K. Stapleton issued his Order and Opinion in *Texaco, Inc., et al. v. Department of Energy, et al.*, 490 F.Supp. 874 (D.Del.1980) *("Texaco")*. Judge Stapleton dismissed the complaints of Texaco and LL&E, and found that the court lacked jurisdiction because the claims were not ripe for judicial review. Judge Stapleton declined to rule on DOE's motion to dismiss the complaint of Louisiana, noting his intent to await the Answer of the agency in which it could assert improper venue under 28 U.S.C. § 1391(e).

On May 15, 1980, Louisiana noticed its voluntary dismissal of the action in Delaware, and on May 27, 1980, it filed the instant action in the U. S. District Court for the Western District of Louisiana. This Court granted Texaco's motion to intervene in this action by an Order issued June 23, 1980. It similarly granted LL&E leave to intervene in this action by an order issued July 2, 1980.

### Lack of Standing

■ DOE claims that since Louisiana is alleging injury to its citizens generally as a result of lost tax revenues, Louisiana is attempting to bring this action as *parens patriae* on behalf of its citizens. Without conceding that loss of tax revenues is solely an action based on *parens patriae*, plaintiff has admitted in its argument[4] that it does not sue in *parens patriae* on behalf of its citizens but for loss of tax revenues.

Therefore, it must be decided whether or not Louisiana has a proprietory interest to sue as a taxing sovereign and royalty owner to determine standing. In *Association of Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court delineated a two-part test for determining whether a party has standing to challenge administrative action; first, the plaintiff must demonstrate that it has suffered an injury in fact, and, second, that the plaintiff's interests are arguably within the zone of interests to be protected or regulated by the statute in question.

DOE asserts that Louisiana cannot meet the first part of the test since its claim of injury is no more than speculation that it may be required to reimburse producers for overpayments of severance taxes and royalties in the future. Louisiana may, however, start receiving less severance taxes and royalties in the not too distant future. Further, the argument by the DOE that only the possibility exists that the agency will determine that producers have violated the federal price regulations because of their designations of LOC units as separate properties is not realistic and cannot be accepted by this Court. To turn that argument

---

adjudicatory proceeding before the Office of Hearings and Appeals ("OHA") of the DOE. 10 C.F.R. § 205.193(a).

4. Page 50 in oral argument, October 3, 1980.

around, it is more likely there is only a possibility that the agency will determine that producers have *not* violated the federal price regulations.

DOE contends that Louisiana cannot meet the second requirement of the standing test because its interests do not come within the zone of interests to be protected. DOE asserts that Section 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 is extended only with respect to final agency action and in the instant case, the agency has issued no final determination that producers of crude oil are in violation of the federal price regulations for their designation of LOC units as separate properties.

It should be noted that Louisiana is not challenging the enforcement proceedings that DOE has brought against producers in Louisiana, but the DOE's position on property which Louisiana asserts is *final.* This position was made by DOE in the Texaco case, and it was properly rejected by the Court, at 490 F.Supp. 885, 886:

> (P)laintiffs primarily seek not review of the agency's enforcement proceeding currently pending against Texaco, but rather extraenforcement review of the DOE regulatory pronouncements upon which the enforcement proceeding is concededly predicated, Rulings 1975–15, 1977–1, and 1977–2, as well as the notice issued August 20, 1976 . . . (I)t is unmistakable . . . that their quarrel is with the regulations rather· than the compliance proceeding.

Further, the DOE conceded that the OHA is bound to treat the challenged regulation as valid in the Delaware action. As Judge Stapleton explained at 490 F.Supp. 886 n. 17:

> At oral argument counsel for the DOE conceded that the OHA would be bound to treat the challenged regulations as valid and took no position as to FERC's authority to disregard them or to find them to be invalid. Tr. of Oral Argument at 118.

A DOE ruling is an interpretation of general applicability. 43 Fed.Reg. 3569 (January 26, 1978). Such a ruling is not subject to administrative appeal. 10 C.F.R. § 205.154 (1980).

> It is clear as Judge Stapleton found: Neither the DOEA nor the relevant regulations indicate that DOE will consider the validity of the challenged regulations at a subsequent stage of the compliance process. (490 F.Supp. at 886)

■ An agency position "is clearly 'final agency action' . . . (where it) will not be the subject of any further proceedings at the (agency)." *Ecee, Inc. v. Federal Energy Regulatory Commission, supra,* 611 F.2d at 557. As the Lake Charles Division of this Court has stated:

> The label an agency attaches to its action is not dispositive. The action may be reviewable even though it is an announcement of a rule or policy that the agency has not yet put into effect. *Dow Chemical, supra,* 459 F.Supp. at 386.

### Claims Not Ripe for Judicial Review and Plaintiffs Have Failed to Exhaust Administrative Remedies

· DOE takes the position that the claims raised by Louisiana are not ripe for judicial review.

■ The application of the ripeness doctrine to pre-enforcement judicial review of administrative actions requires that the reviewing court, before undertaking review of a purported agency action, finds that the following four factors are all present: (1) the issues presented are purely legal, (2) the issues arise out of final agency action, (3) the controversy has a direct and immediate impact on plaintiff's business, *and* (4) litigation of the controversy will expedite final resolution of the matter rather than delay or impede effective agency enforcement efforts. *Abbott Laboratories, Inc. v. Gardner, supra; Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Bankers Life & Cas. Co. v. Callaway,* 530 F.2d 625 (5th Cir. 1976); *Pennzoil Company v. Department of Energy,* 466 F.Supp. 238 (D.Del.1979); *Phillips Petroleum Co. v. Federal Energy Administration,* 435 F.Supp. 1239 (D.Del.1977).

■ The question as to whether the issues presented are purely legal has been partially covered. Louisiana is not asking this Court to examine any particular LOC unit to determine if it meets the regulatory "criteria". Rather, Louisiana asks this Court to examine the applicable regulations, rulings and interpretations and to declare what the proper "criteria" are. Any factual controversy as to whether producers' designations properly conformed to the correct interpretation of "property" is severable from the issue of what that correct interpretation is.

The essence of Louisiana's claim is that DOE, in its August 20, 1976 rulemaking, restated in Ruling 1977–1, improperly interpreted the 1973 CLC definition of "property". This claim raises two purely legal issues: (i) whether DOE's interpretation is valid; and, (ii) if DOE's interpretation is valid, whether it is the only reasonable interpretation and thereby entitled to retroactive application.[5]

As Judge Stapleton found in the Texaco case, this Court also finds that plaintiff herein does not ask this Court to determine whether *any property* involved in the RO proceeding does or does not violate Rulings 1975–15, 1977–1, and 1977–2. The resolution of the legal issues raised by plaintiff do not fall within the special competence of the DOE or require further development of a factual record. Each requires this Court only to examine the language of the regulations, in the context of the Congressional intent behind the applicable statutes, and the relevant regulatory decisions.

DOE contends that there has been no "final agency action" on the position that LOC units *per se* may not be treated as separate properties for purposes of price regulations. The DOE's interpretation in Rulings 1977–1 and 1977–2, in this Court's opinion, constitutes the Department's final position on the "property" definition.

The regulations allow certain state-recognized producing reservoirs to be treated as separate properties by virtue of state recog-

nition alone, but such treatment would be effective only from September 1, 1976, onward. That final position has certainly caused injury to Louisiana.

Even if OHA can reconsider DOE's "property" interpretation, this Court should not withhold review. Herein, the lines are drawn, the positions are taken and the matter is ripe for judicial review. *State of Florida v. Weinberger*, 492 F.2d 488 (5th Cir. 1974).

DOE asserts that the controversy does not have a direct and immediate impact on Louisiana, and that a potential injury to its treasury is insufficient to support a finding of the kind of hardship which is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage. In support of this position, DOE relies on the decision of the Delaware case, wherein Judge Stapleton stated that Texaco and LL&E were not confronted with a direct and immediate hardship, supra, 490 F.Supp. at Page 888:

> In the typical case, though the Court conducts a searching inquiry to determine whether the party seeking relief satisfies the hardship requirement of the ripeness doctrine, it is taken for granted that the plaintiff is subject to the challenged action, that compliance with the action is expected by the agency, and that compliance will entail costs for the plaintiff. *See, e. g., National Automatic Laundry and Cleaning Council v. Schultz*, [143 U.S. App.D.C. 274], 443 F.2d 689 (D.C.Cir. 1971); *Pennzoil v. Department of Energy, supra*, 466 F.Supp. 238; *Romeo Community Schools v. Department of Health, Education, and Welfare*, 438 F.Supp. 1021, 1028 (E.D.Mich.1977). In the instant case, however, Texaco denies that compliance with the DOE regulations it seeks to challenge will impose any costs upon it by asserting, in its "secondary" position, that it has not violated those regulations. While the pricing dilemma Texaco would face might satisfy the

---

**5.** Whether DOE employed the proper administrative procedures in arriving at its interpretation has been withdrawn from the Court's con-

sideration in view of Louisiana's Amended Complaint.

hardship requirement were it clear that it violated the regulations, I do not understand how Texaco can be placed on the horns of a pricing dilemma by regulations with which it purports to comply and with which the DOE has yet to determine it does not comply. In short, Texaco has failed to allege or show that compliance with the DOE regulations it challenges will impose any costs upon it, let alone place it on the horns of an ongoing pricing dilemma.

DOE contends that Louisiana's position in the present controversy is the same as that of LL&E in the Delaware case, and that position finds some support in Judge Stapleton's opinion, at Pages 34–35:

> In the absence of either a final DOE determination that LOC units in which LL&E holds a . . . royalty interest are designated as properties in violation of the challenged regulations or a concession to that effect by LL&E, therefore, the hardship it fears is simply too speculative to permit judicial review at this time.

> \*   \*   \*   \*   \*   \*

Like Texaco's and LL&E's complaints, Louisiana's makes the alternative assertions that Texaco's LOC units may be designated as properties consistent with the challenged regulations and that the regulations are invalid only to the extent that they purport to prohibit such designations. Accordingly, any hardship which Louisiana may suffer as a result of DOE action with respect to Texaco's pricing practices is also too speculative under the ripeness doctrine to justify immediate judicial review.

However, Louisiana contends that it is presently receiving reduced royalties from some oil produced from properties it owns and is receiving diminished severance taxes from some of the oil produced in the State.

Producers who have followed, or are following, DOE's ruling that the leasehold, rather than the LOC unit, defines the "property" have paid and are paying to Louisiana, reduced severance taxes and royalties.[6]

In *Com. of Pa. by Shapp v. Kleppe*, 174 U.S.App.D.C. 441, 533 F.2d 668 (1976), the Court recognized the principle that lost tax revenues could confer standing where there existed "some fairly direct link between the state's status as a collector and recipient of revenues, and the legislative or administrative action being challenged."

The injury need not occur prior to judicial review and agency action may be reviewable even though it is never to have any formal effect. *Dow Chemical v. Consumer Product Safety Commission*, 459 F.Supp. 378, 386 (1978). In *State of Florida v. Weinberger*, supra, 492 F.2d at 492, the Court found sufficient injury to Florida in the choice between undertaking "likely financial outlay, and certain legislative and administrative effort" or undergoing the "risk (of) the at least temporary loss of funding which a conformity hearing . . . could well produce."

Louisiana is not merely a complainant whose rights are affected *only* on the contingency of future administrative action. Producers *other than Texaco* which make royalty and severance tax payments to Louisiana have acceded to the views which they believe are expressed in Rulings 1975–15, 1977–1, and 1977–2, and have thereby refunded the overcharges resulting from their earlier treatment of multiple LOC's located on a single premises as multiple properties, and have made claims against Louisiana for

**6.** Producers who have stopped treating LOC units as "properties" on the basis of DOE's view of "property" as a leasehold have sought *from the State recoupment of allegedly excess royalties paid.* On September 11, 1978, there were pending before the State Mineral Board claims for recoupment of supposedly excess royalties paid, based on oil pricing decisions by companies where there had been no FEA audit, of $393,842.81. Not all of these claims were based on changes in the treatment of "proper-

ties". However, one claim was by Shell Oil Company for $86,116.00 based on its view that it had improperly treated an LOC Proration Reservoir as a separate "property" and had overpaid royalties in that amount. Also, Kerr-McGee Corporation, on being accused by DOE of overcharges in excess of one million dollars because it treated LOC reservoir units as separate "properties", demanded recoupment of $128,591.19 in royalties.

refunds of corresponding amounts of royalty and severance tax payments.

Therefore, it appears that only prompt resolution of the overriding legal question—to interpret the regulation which defines property as a right to produce from a lease or a fee interest—can alleviate any injury that Louisiana has experienced as a result of DOE's action.

The Court feels that the resolution of this legal question will foster rather than impede the final resolution of this matter.

*Action Should Be Stayed Under the Doctrine of Primary Jurisdiction*

■ DOE contends that this action should be stayed under the doctrine of primary jurisdiction. In *Mississippi Power & Light Co. v. United Gas Pipe Line*, 532 F.2d 412 (5th Cir. 1976), cert. denied, the Fifth Circuit elucidated the purpose of primary jurisdiction:

> When legal disputes develop that directly affect an industry subject to regulation, the need arises to integrate the regulatory agency into the judicial decision making process. One method to accomplish integration is to have the agency pass in the first instance on those issues that are within its competence. In short, the agency should have the *first word* (*Id.* at 417 (emphasis added).)

As suggested by plaintiff, here the DOE had the "first word" but its first word was also its final word. In *Phillips Petroleum Co. v. Federal Energy Administration*, supra, the Court stated 435 F.Supp. at Page 1249:

> The FEA has already had the first word and made final decision on the legal issues for determination before this Court. Plaintiffs here simply seek review of the final agency decision, calling into question the *meaning* and *validity* of the *relevant regulations*. Thus, the doctrine of primary jurisdiction is inapplicable to this litigation with respect to the issues finally determined by the FEA. (435 F.Supp.

at 1249 (citations omitted; emphasis added).)

In *Standard Oil Co. v. Federal Energy Administration*, 440 F.Supp. 328, 371 (1977), the Court declined to accept FEA's invitation to refer to the agency issues to which the agency had reached a final position.

*Texaco and LL&E as Intervenors*

[6] Since this Court feels that Louisiana is properly before the Court, it is unnecessary to consider whether Texaco meets the standards for ripeness or exhaustion of administrative remedies, and Judge Stapleton's decision in the Delaware case is not a bar to Texaco's intervention in this action. Therein, Judge Stapleton held that Texaco failed to meet one of the four requirements of ripeness but that holding cannot be a bar on the ground of res judicata because ripeness is not required for intervention as of right under Rule 24 of the Federal Rules of Civil Procedure. At this point, the question is whether the prospective intervenor has a sufficient stake in the outcome and enough to contribute to the resolution of the controversy to justify his inclusion. *Trbovich v. United Mine Workers*, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).[7] Since the regulations and rules placed in issue by Louisiana herein are the same regulations and rules under which the DOE has charged Texaco with exceeding by almost $800 million the authorized price for domestic crude produced by Texaco, it is clear that Texaco has a sufficient stake in this controversy.

What has been said in regard to Texaco is equally applicable to LL&E. LL&E is a working or royalty interest owner in a number of crude oil producing properties in Louisiana, the production of which consistently has been accounted for and priced on the basis that LOC units may be designated as separate "properties" under the Mandatory Petroleum Price Regulations ("MPPR"). In the event that LL&E's contention that LOC units constitute separate properties is rejected, recently initiated in-

---

**7.** See also Shapiro, *Some Thoughts On Intervention Before Courts, Agencies, and Arbitrators*, 81 Harv.L.Rev. 721, 726 (1968), cited in

*Trbovich v. United Mine Workers*, 404 U.S. at 536 n.7, 92 S.Ct. at 635 n.7.

ternal audits which have been conducted by LL&E have revealed that crude oil production from certain of the LL&E properties have been sold at a price which would be unlawful under the MPPR. Consequently, LL&E will be subject to substantial refund and penalty requirements, and the decision adverse to the plaintiff, Louisiana, in this litigation, would have immediate and substantial harmful impact upon the interests of LL&E. Furthermore, if 10 C.F.R. § 212.-72 is construed to disallow LOC units as separate properties, LL&E has ascertained and now concedes that it has no other factual or legal basis for the prices charged for crude oil production from a number of its substantial Louisiana properties at issue in the enforcement proceedings.

For the record, this Court would differ with Judge Stapleton's conclusion that since plaintiff contends that producers have not violated federal price regulations, the claims are not ripe for judicial review. We live in a real world. This Court cannot, under real world standards, believe that the PRO issued by the DOE to Texaco on May 1, 1979, alleging overcharges approaching $800 million are totally unfounded under the DOE's applied criteria and will be rejected in the administrative proceedings. As the Court stated in *Phillips Petroleum v. Federal Energy Administration*, supra, 435 F.Supp. at 1248 (1977), "A Court should not stand aside just because there is available to the plaintiff some collateral agency proceedings that hold out the *possibility* of some kind of relief."

## Conclusion

In 1973, following the presidential decision to freeze the price of domestic crude oil, the CLC promulgated regulations under which the price at which crude oil could be sold depended on the vintage of the "property" from which it was produced. CLC defined "property" as "the right which arises from a lease or from a fee interest to produce domestic crude petroleum". Since that time, Louisiana and producers within the state have regarded LOC-recognized production units as "properties" under that definition.

Whether the designation of LOC units *per se* as "separate properties" is valid under the proper interpretation of the regulatory definition of property is not before the Court. The agency will apply the federal regulations which set forth when a property may be designated as a property. Louisiana has a separate criteria which it uses for the purpose of its conservation laws; i. e., LOC designations.

However, the DOE remained silent after 1973, as to the interpretation and application of the property concept for almost two years and producers construed this regulation to permit them to treat LOC units as separate properties. Was that reasonable? Not necessarily so. There may be LOC units that cannot be reasonably interpreted to be consistent with the goals to control inflation and stimulate increased production.[8] The DOE will have to make such a determination under its ongoing proceedings. On the other hand, there may be LOC units that clearly qualify, but not because they are LOC units.

In the August, 1976 preamble to the amended definition of property, the FEA implied that as originally drafted, § 212.72 prohibited the designation of LOC units as properties and asserted for the first time that 1975-15 had expressly precluded the designation of "separate pools and reservoirs" as individual properties even if recognized by state regulatory agencies. Further, the FEA announced its intention to enforce this interpretation on a retroactive basis against producers, and at the same time, permitted producers to treat as a separate property, each separate and distinct producing reservoir but only prospectively from September 1, 1976.[9] This Court can

---

**8.** The DOE contends that the primary Congressional objective was to stem the tide of inflation by limiting the price of oil and "nowhere did Congress require the President to affirmatively encourage oil production". Due to the seriousness of the oil shortage, it goes without saying that a primary goal of Congress was to increase production, otherwise there would be no reason to establish an upper tier price.

**9.** 41 Fed.Reg. 36172, 37179 (August 26, 1976).

only conclude that if this is just and right, then all we have been taught in the past is wrong. The meaning of "property" as treated herein should be constant. It should not change with a change in the economic and political climate. If the DOE will accept LOC reservoir-wide units as property after September 1, 1976, it was certainly reasonable for producers to treat them as properties before 1976.

 It is clear that the original property definition was ambiguous and subject to various "good faith interpretations". 41 Fed.Reg. 3172 (Aug. 20, 1976).[10] Even when you play "pin the tail on the donkey", the rules require that you turn the blindfolded participant in the right direction. The cases are clear that a *post hoc* agency interpretation of an ambiguous regulation should not be enforced retroactively against a regulated party who adopted and applied an alternate reasonable interpretation of the regulation during the period between the initial promulgation of the ambiguous regulation and the later agency interpretation. *Standard Oil Co. v. Federal Energy Administration*, 453 F.Supp. 203 (1978); *Phillips Petroleum Co. v. Federal Energy Administration*, 449 F.Supp. 760 (1978); *Standard Oil Company v. Department of Energy*, 596 F.2d 1029 (Em.App.1978).

The defendants' Motion to Vacate the orders granting intervention to Texaco and LL&E is DENIED, and the Court will allow intervention by Texaco and LL&E under Rule 24(a) of the Federal Rules of Civil Procedure.

The Court will deny the defendants' Motion to Dismiss the complaint of Louisiana, and consider the question of whether separate and distinct producing reservoirs that qualify as separate properties under the amended 1976 definition would have been a valid and reasonable interpretation under the regulatory definition of properties from August 19, 1973, to September 1, 1976.[11]

---

10. In *Grigsby v. Department of Energy*, 585 F.2d 1069, *modified on rehearing*, 585 F.2d 1080 (Em.App.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979), the Court held that "property is to be defined as the 'right to produce' ", at Page 1083:

> The focus of the "property" definition is upon the "right to produce," not the fee or leasehold nature of the ownership interest...
>
> \* \* \* \* \* \*
>
> The "right to produce" arises from a combination of sources, including, but not limited to, the nature of the ownership interest, con-

tractual extension or restriction of ownership interest, and *orders of state regulatory agencies*... Although the fee or leasehold interest may be the origin of the "right to produce", such a *"right to produce" is controlled, limited, or extended by contractual agreement and state authorities.*

11. August 19, 1973 was the effective date of the two-tier pricing system for crude oil and September 1, 1976 was the effective date DOE interpreted property as used in the 1973 definition to be synonymous with the surface acreage of the lease or fee interest.