873 F.2d 1387
 53 Ed. Law Rep. 456
 Dr. Werner ROGERS, in his official capacity as the State
School Superintendent, State Board of Education of State of
Georgia, DeKalb County School District and School District
of the City of Savannah and the County of Chatham,
Plaintiffs-Appellants,
v.
Dr. William BENNETT, in his official capacity as Secretary
of the United States Department of Education, and
The United States Department of
Education, Defendants-Appellees.
 No. 87-8904.
 United States Court of Appeals,
Eleventh Circuit.
 March 23, 1989.
As Amended May 5, 1989.
 
 Al Evans, Asst. Atty. Gen., Atlanta, Ga., for plaintiffs-appellants.
 Griffin B. Bell, Jr., Fisher & Phillips, Atlanta, Ga., for Savannah-Chatham Co.
 Julie J. Jennings, Weeks & Candler, Charles L. Weatherly, Atlanta, Ga., for DeKalb County School Dist.
 U.S. Dept. of Justice, Civil Rights Div. Jessica Dunsay Silver, William Bradford Reynolds, Washington, D.C., for U.S. Dept. of Educ.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before TJOFLAT and FAY, Circuit Judges, and FAWSETT*, District Judge.
 TJOFLAT, Circuit Judge:
 
 
 1
 In this case, the Georgia State Board of Education and two local school districts challenge the jurisdiction of the United States Department of Education's Office of Civil Rights to investigate parental complaints concerning the education of their handicapped children. The district court dismissed the Georgia educators' suit for failure to exhaust administrative remedies, and they now appeal. We affirm.
 
 I.
 
 2
 The dispute between the appellants and the Office of Civil Rights (the OCR) centers on the proper interpretation of section 504 of the Rehabilitation Act of 1973, Pub.L. No. 93-112, Sec. 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. Sec. 794 (Supp. IV 1986)) [hereinafter section 504], and on the intended interplay between section 504 and the Education of the Handicapped Act, 20 U.S.C. Secs. 1400-1485 (1982 & Supp. IV 1986). We therefore briefly sketch the relevant provisions of these acts and the facts giving rise to the parties' dispute.
 
 
 3
 In 1970, Congress enacted the Education of the Handicapped Act (the EHA). See Pub.L. No. 91-230, Sec. 601, 84 Stat. 175 (1970) (codified as amended at 20 U.S.C. Secs. 1400-1485 (1982 & Supp. IV 1986)). The purpose of the EHA is:
 
 
 4
 to assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children.
 
 
 5
 20 U.S.C. Sec. 1400(c) (1982). The EHA is comprehensive in scope, providing for the federal funding of local special education programs, resource centers and other special services, programs to train special education teachers, and research projects.[1] In exchange for these funds, states agree to adhere to federal regulations regarding the education of the handicapped. In 1975, Congress amended the EHA to provide a specific, exclusive administrative procedure by which parents can challenge the adequacy of the educational programs designed for their children. See Education for All Handicapped Children Act of 1975, Pub.L. No. 94-142, Sec. 5(a), 89 Stat. 776 (codified as amended at 20 U.S.C. Sec. 1415 (1982 & Supp. IV 1986)); see also Smith v. Robinson, 468 U.S. 992, 1009, 104 S.Ct. 3457, 3467, 82 L.Ed.2d 746 (1984) (holding that if available, parental administrative remedies under the EHA are exclusive).[2]
 
 
 6
 In the period between the original enactment of the EHA and its amendment in 1975, Congress passed the Rehabilitation Act of 1973. See Pub.L. No. 93-112, 87 Stat. 355 (codified as amended in scattered sections of 29 U.S.C.). The main purpose of the Rehabilitation Act was to provide funding for the vocational rehabilitation of handicapped individuals. See id., Sec. 2, 87 Stat. at 357. A miscellaneous provision at the end of the Act, however, also provided handicapped individuals with general protection against discrimination, stating that:
 
 
 7
 No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 8
 Id., Sec. 504, 87 Stat. at 394. Significantly, section 504 only prevents discrimination against the handicapped; unlike the EHA, it does not require that states devote extra resources to meeting the needs of handicapped individuals. See Robinson, 468 U.S. at 1018-19, 104 S.Ct. at 3471-72; Southeastern Community College v. Davis, 442 U.S. 397, 410-11, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). To implement the provisions of section 504, the Department of Education (the Department)[3] issued regulations that prohibit state and local officials from discriminating against the handicapped in the provision of a free and appropriate public education to school-aged children. See 34 C.F.R. Sec. 104.33 (1988).[4] These regulations are administered by the OCR.[5]
 
 
 9
 Two parallel procedures enforce these antidiscrimination regulations. First, parents are afforded certain procedural rights in a dispute with a local educational authority regarding the education of their handicapped children. See id. Sec. 104.36. Upon exhausting these procedures, aggrieved parents can take advantage of the remedial provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000d-1, 2000d-2 (1982), and bring suit in federal court to remedy the alleged violation of section 504. See 29 U.S.C. Sec. 794a(a)(2) (1982).[6] In 1984, however, the Supreme Court held that this administrative procedure for parental complaints is largely supplanted by the more comprehensive remedial scheme established by the 1975 amendments to the EHA. See Robinson, 468 U.S. at 1021, 104 S.Ct. at 3473.[7]
 
 
 10
 As a second enforcement mechanism for section 504, the Department promulgated certain regulations that authorized it to conduct reviews of state and local educational institutions to assure compliance with the provisions of section 504. See 34 C.F.R. Secs. 104.61, 100.7 (1988). The OCR initiates these compliance reviews on a periodic basis or in response to information that indicates a possible failure to comply with section 504. See id. Sec. 100.7(a), (c). A parental complaint is the typical source of such information.[8] If the state or local educational institution fails or refuses to cooperate with the OCR's investigation, the Department of Education may seek to effect the institution's compliance with 34 C.F.R. Sec. 100.7 by initiating proceedings to terminate federal financial assistance to that institution. See id. Sec. 100.8.[9]
 
 
 11
 Acting in response to several parental complaints under section 504, the OCR initiated individual investigations of the special education programs in Chatham County (Georgia), DeKalb County (Georgia), and of the State of Georgia's Department of Education. Both the administrators of the county special education programs and officials in the Georgia Department of Education refused to cooperate with the OCR's investigation. As a result, the OCR began administrative proceedings to terminate federal funding of these three institutions' handicapped programs.
 
 
 12
 In response to these administrative proceedings, the Georgia State Board of Education and the DeKalb and Chatham County school districts brought suit against the United States Department of Education in federal district court, alleging that the OCR was acting beyond its jurisdiction in investigating parental complaints concerning the educational opportunities available to handicapped students in the Georgia programs.[10] The Georgia educators therefore sought a declaration that such investigations were beyond the agency's jurisdiction and an order enjoining the OCR from investigating the complaints. The OCR subsequently moved for dismissal, arguing that the plaintiffs had failed to exhaust their administrative remedies. The district court granted the motion, dismissing the action. The Georgia educators now appeal, contending that exhaustion of administrative remedies is not a necessary precondition to the adjudication of their claims. We disagree.II.
 
 
 13
 One of the primary purposes in requiring plaintiffs to exhaust their administrative remedies is to assure that the courts review ripe controversies, presenting concrete injuries. Thus, the Supreme Court has stated that:
 
 
 14
 Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.
 
 
 15
 Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (footnote omitted). In the instant case, the Department has not yet terminated federal funding for the appellants' special education programs. Nevertheless, the appellants argue that their suit is ripe, citing our decision as part of the former Fifth Circuit in Florida v. Weinberger, 492 F.2d 488 (5th Cir.1974).[11]
 
 
 16
 In Weinberger, the Department of Health, Education, and Welfare promulgated final regulations that reversed the agency's previous policy, to which Florida had conformed its laws. Faced with the prospect of either amending its statutes or losing federal funding, Florida brought suit asserting that the regulations exceeded the Secretary's authority. Although the Secretary had not initiated proceedings to terminate Florida's federal funding, we held that:
 
 
 17
 We are unable to see the reason, especially where the confrontation has been the result of the Secretary's adoption of a regulation at variance with his former policy upon which the state presumably relied in constructing its statutory agency, in placing the sovereign state of Florida at such risk when so little would be gained by doing so and so much might be lost. The lines are drawn, the positions taken, and the matter is ripe for judicial review.
 
 
 18
 Id. at 493.
 
 
 19
 Under Weinberger, we could hold that appellants' complaint presents a cognizable injury, even though the OCR has not yet succeeded in terminating federal funding to the Georgia programs. Nevertheless, we stress the unique factual circumstances in that case: both parties had taken final, dispositive, and contrary legal positions, thus making the future injurious agency action inevitable. In the instant case, however, such a crystallization of legal positions has not yet occurred. As our discussion below indicates, we believe that the merits of this dispute may hinge on the OCR's interpretation and explanation of the Department's regulations. Until the appellants exhaust their administrative remedies, thereby allowing the agency officially to formulate its approach to the relevant regulations, we believe that the issues presented by this action will not be ripe for adjudication.
 
 III.
 
 20
 An examination of the exhaustion doctrine confirms our conclusion that this case is not ripe for adjudication. That doctrine denies judicial relief to a party challenging agency action until that party has exhausted all of its available administrative remedies. See, e.g., Patsy v. Florida Int'l University, 634 F.2d 900, 902-04 (5th Cir.1981) (en banc) (explaining doctrine and exceptions thereto), rev'd on other grounds, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). This court has applied this doctrine to a suit challenging an agency's jurisdiction to act, holding that the agency ordinarily should be given the first opportunity to consider the challenge. See Deltona Corp. v. Alexander, 682 F.2d 888, 893 (11th Cir.1982); see also Imperial Carpet Mills, Inc. v. Consumer Prods. Safety Comm'n, 634 F.2d 871, 874 (5th Cir. Unit B Jan.1981) ("Questions of an agency's authority and jurisdiction have long been held by the courts to be particularly appropriate for initial agency determination."). Thus, we would ordinarily require the appellants first to exhaust their administrative remedies with the OCR before allowing them to bring a judicial challenge to the authority of the OCR to investigate the Georgia special education programs.
 
 
 21
 In some circumstances, however, this court will not require a party challenging an agency's jurisdiction to exhaust its administrative remedies. Thus, we will excuse a litigant's failure to exhaust its administrative remedies if:
 
 
 22
 (1) there is clear evidence that exhaustion of administrative remedies will result in irreparable injury; (2) the agency's jurisdiction is plainly lacking; and (3) the agency's special expertise will be of no help on the question of its jurisdiction.
 
 
 23
 Marshall v. Burlington Northern, Inc., 595 F.2d 511, 513 (9th Cir.1979); see also Shawnee Coal Co. v. Andrus, 661 F.2d 1083, 1093 (6th Cir.1981) (adopting same test); 4 K. Davis, Administrative Law Treatise Sec. 26:5 (2d ed.1983) (explaining test, first proposed in 1958 edition of the Treatise).[12] We note that the first element of this test simply states a basic prerequisite for the granting of equitable relief: before a court can enjoin a party from acting, a plaintiff must first establish that his legal remedy is inadequate and that he will be irreparably harmed if the court does not intervene. We further note that the second and third elements of the test are intertwined: if the intricacies of the regulatory scheme are so murky that the court feels that it would benefit from the agency's expertise, the court will be unable to conclude that the agency plainly lacks jurisdiction. We examine the three elements of this test in turn.
 
 A.
 
 24
 As an initial matter, we must determine whether requiring appellants to exhaust their administrative remedies will cause them irreparable injury. We conclude that it will not. Requiring exhaustion will not preclude the appellants from having an opportunity to dispute the OCR's jurisdiction to investigate alleged violations of section 504: should the Department eventually terminate federal funding for the Georgia special education programs, the educators can appeal the agency's action by refiling this suit in the district court. Nor would handicapped children in Georgia be deprived of funding pending the adjudication of the termination's validity. Assuming that the Department wrongfully terminated the Georgia programs' funding, any injury that might be caused to handicapped children pending such adjudication could be avoided by invoking the court's equity powers. The court would be able to stay the funding's termination by entering a temporary restraining order, and, if necessary, a preliminary injunction. See generally Fed.R.Civ.P. 65. The possibility that the court might erroneously refuse to grant such interim relief, thus resulting in injury to the children, does not constitute the sort of irreparable harm that would authorize us to excuse appellants from exhausting their administrative remedies.
 
 B.
 
 25
 We next examine whether the OCR is plainly without jurisdiction to investigate state special education programs under section 504 in response to a parent's complaint. In arguing that the OCR is without jurisdiction, the appellants make two arguments worthy of discussion.[13]
 
 
 26
 Appellants first make a broad attack on the validity of the Department's regulations implementing the mandate of section 504. See 34 C.F.R. pt. 104 (1988). Appellants argue that Congress never authorized the Department to promulgate these regulations, and that they are therefore invalid. We agree that the Department's authority to issue regulations under section 504 is not entirely clear.[14] Nevertheless, we conclude that the Department was not plainly without authority in so acting.
 
 
 27
 When section 504 was originally enacted, it contained no language expressly authorizing the promulgation of implementing regulations. As a result, the Department initially refused to promulgate regulations implementing section 504, believing the section to be self-executing. See Southeastern Community College v. Davis, 442 U.S. 397, 404 n. 4 & 411 n. 11, 99 S.Ct. 2361, 2366 n. 4 & 2370 n. 11, 60 L.Ed.2d 980 (1979). Congress, however, clarified its intent in the legislative history accompanying the Rehabilitation Act Amendments of 1974, Pub.L. No. 93-516, 88 Stat. 1617. The report accompanying that Act indicates that Congress intended federal agencies to implement section 504 by means of appropriate regulations:
 
 
 28
 [Section 504] constitutes the establishment of a broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap. It does not specifically require the issuance of regulations or expressly provide for enforcement procedures, but it is clearly mandatory in form, and such regulations and enforcement are intended.
 
 
 29
 The language of section 504 ... further envisions the implementation of a compliance program ... including promulgation of regulations providing for investigation and review of recipients of Federal financial assistance, attempts to bring non-complying recipients into voluntary compliance through informal efforts such as negotiation, and the imposition of sanctions against recipients who continue to discriminate against otherwise qualified handicapped persons on the basis of handicap. Such sanctions would include, where appropriate, the termination of Federal financial assistance to the recipient or other means otherwise authorized by law.
 
 
 30
 Sen. R. No. 1297, 93d Cong., 2d Sess. at 39-40, reprinted in 1974 U.S.Code, Cong. & Admin.News 6373, 6390 (emphasis added). The Report also indicates that Congress envisioned that the Department would coordinate the promulgation of these regulations. See id. at 40, reprinted in 1974 U.S.Code Cong. & Admin.News at 6391.
 
 
 31
 Faced with this evidence regarding the intent of Congress, the President issued Executive Order No. 11,914. That Order provided in relevant part:
 
 
 32
 By virtue of the authority vested in me by the Constitution and statutes of the United States of America ... and in order to provide for consistent implementation within the Federal Government of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), it is hereby ordered as follows:
 
 
 33
 Section 1. The Secretary of Health, Education, and Welfare shall coordinate the implementation of section 504 of the Rehabilitation Act of 1973, as amended, hereinafter referred to as section 504, by all Federal departments and agencies empowered to extend Federal financial assistance to any program or activity....
 
 
 34
 Sec. 2. In order to implement the provisions of section 504, each Federal department and agency empowered to provide Federal financial assistance shall issue rules, regulations, and directives, consistent with the standards and procedures established by the Secretary of Health, Education, and Welfare.
 
 
 35
 Exec. Order No. 11,914, 3 C.F.R. 117, 117-18 (1977) (1976 compilation of executive orders).[15] In 1980, President Carter revoked Executive Order No. 11,914 in order to transfer oversight of section 504's implementation to the Attorney General. See Exec. Order No. 12,250 Sec. 1-502, 3 C.F.R. 298, 300 (1981) (1980 compilation of executive orders), reprinted in 42 U.S.C. Sec. 2000d-1 app. at 24 (1982). Executive Order No. 12,250 nevertheless provided that all "[e]xisting agency regulations implementing the nondiscrimination provisions [of section 504 and the EHA, among others] shall continue in effect until revoked or modified." Id. Sec. 1-504, 3 C.F.R. at 300 (1981), reprinted in 42 U.S.C. Sec. 2000d-1 app. at 24 (1982).
 
 
 36
 Based on this information regarding the Congressional and executive interpretation of section 504, we conclude that the OCR is not plainly without authority to enforce regulations implementing section 504 of the Rehabilitation Act of 1973. We therefore conclude that the OCR is not acting plainly outside its jurisdiction when it investigates the Georgia special education programs pursuant to 34 C.F.R. Sec. 100.7 (1988).
 
 
 37
 In their second attack on the OCR's jurisdiction to investigate the Georgia programs, appellants contend that the OCR's powers under section 504 were restricted by the Supreme Court's decision in Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). In Robinson, parents of handicapped children brought suit against the Rhode Island Commissioner of Education, protesting the commissioner's decision denying responsibility for their children's education. They complained that the commissioner's decision violated the EHA, section 504 of the Rehabilitation Act, and the fourteenth amendment. After an extensive discussion of the relationships between the statutes and constitutional provision involved, the Supreme Court held that the enforcement mechanisms provided by the EHA were the exclusive method by which parents could challenge state denial of educational benefits to handicapped children. See id. at 1009, 104 S.Ct. at 3467.
 
 
 38
 Robinson leads us to conclude that in the ordinary case, a parent's private remedy under EHA is exclusive. In the instant case, however, the parent is not bringing a suit against the appellants; instead, the federal government itself is investigating the Georgia programs--albeit in response to a parental complaint. We do not believe that such federal supervisory action is plainly precluded by the EHA's detailed scheme for the processing of parental complaints. Thus, in examining the interrelation between section 504 of the Rehabilitation Act of 1973 and the 1975 amendments to the EHA, we conclude that law may allow--and Congress and the President may have intended--two overlapping, complementary schemes of enforcement: one exercised by private litigants through the provisions of the EHA, the other provided by the Department's supervisory investigations of state programs as authorized under the regulations implementing section 504.[16] We therefore conclude that the OCR's exercise of supervisory powers over the Georgia special education programs is not plainly outside of the agency's jurisdiction.
 
 C.
 
 39
 As a final matter we conclude that the Department of Education's expertise in this area will greatly aid judicial review of the issues presented in this case. As our discussion has indicated, the appellants' claims challenge the OCR's authority to promulgate and administer a very complex regulatory scheme--a scheme that coordinates and seeks to implement the provisions of numerous statutes and executive orders. Appellants' exhaustion of their administrative remedies will allow a reviewing court to examine the official agency explanation and interpretation of the regulations and statutes involved.
 
 IV.
 
 40
 In sum, we conclude that the district court acted properly in dismissing the appellants' suit for failure to exhaust administrative remedies. The decision of the district court is
 
 
 41
 AFFIRMED.
 
 
 
 *
 Honorable Patricia C. Fawsett, U.S. District Judge for the Middle District of Florida, sitting by designation
 
 
 [1]
 The EHA is administered by the Department of Education's Office of Special Education Programs. See 20 U.S.C. Sec. 1401 (Supp. IV 1986). Among its other powers, this office can terminate federal funding to state and local handicapped educational programs for failure to comply with the provisions of the EHA. See id. Sec. 1416 (1982 & Supp. IV 1986)
 
 
 [2]
 We note that aggrieved parents who have exhausted their administrative remedies under the EHA may seek judicial review of the agency's determination. In Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), the Supreme Court determined that the EHA was the exclusive basis for such review, precluding parents from bringing suit under section 504 or the fourteenth amendment in addition to the EHA. In response to this decision, Congress amended the EHA specifically to overrule this aspect of Robinson and to allow parents to avail themselves of all appropriate statutory and constitutional remedies when seeking judicial review of their child's educational opportunities. See Handicapped Children's Protection Act of 1986, Pub.L. No. 99-372, Sec. 3, 100 Stat. 796, 797 (codified at 20 U.S.C. Sec. 1415(f) (Supp. IV 1986)); see also Sen. R. No. 112, 99th Cong., 2d Sess. at 2-3, reprinted in 1986 U.S.Code Cong. & Admin.News 1798, 1799-1800
 
 
 [3]
 The Department of Education was at that time a part of the Department of Health, Education, and Welfare. In 1979, the Department of Health, Education, and Welfare was split into two separate agencies: the Department of Health and Human Services and the Department of Education. See generally Department of Education Organization Act, Pub.L. No. 96-88, 93 Stat. 668 (1979). This opinion uses the term "the Department" both to refer to the Department of Education as it existed after 1979 and to refer to the education functions exercised by the Department of Health, Education, and Welfare before 1979
 
 
 [4]
 These regulations were promulgated in 1977. See 42 Fed.Reg. 22,67 6, 22,677 (1977) (codified at 45 C.F.R. pt. 84 (1978)). These regulations, as originally promulgated, authorized the Department to conduct the compliance reviews that are the subject of the instant dispute. See 45 C.F.R. Secs. 80.7, 84.61 (1978). These regulations were eventually transferred on the creation of the Department of Education in 1979 to 34 C.F.R. Secs. 100.7 and 104.61. See 45 Fed.Reg. 30,802, 30,918 (1980)
 
 
 [5]
 As noted supra note 3, the Department of Education was a part of the Department of Health, Education, and Welfare until 1979. At that time, all functions of HEW's Office of Civil Rights that related to education were transferred to the new Office of Civil Rights created within the Department of Education. See 20 U.S.C. Sec. 3441(a)(3) (1982) (transferring functions); id. Sec. 3413(a) (creating Office of Civil Rights within the Department of Education). These responsibilities included administration of the regulations implementing section 504. See S.Rep. No. 49, 96th Cong., 1st Sess. 36, reprinted in 1979 U.S.Code Cong. & Admin.News 1514, 1550
 
 
 [6]
 We note that the Supreme Court's decision in Robinson did not render these procedures moribund. Section 504 is much broader in scope than is the EHA, prohibiting discrimination against otherwise qualified handicapped individuals in all federal programs and programs receiving federal funding. Thus, section 504 regulates many activities--even within the limited field of education--that are not a primary concern of the regulations promulgated pursuant to the EHA. For example, the regulations to section 504 prohibit educational institutions from discriminating against the handicapped in hiring, see 34 C.F.R. Secs. 104.11-.14 (1988), and require that educational institutions provide the handicapped access to the institutions' physical facilities, see id. Secs. 104.21-.23. With regard to these areas and others, the administrative hearing mechanisms of 34 C.F.R. Secs. 100.9 and 100.10 are still a vital part of the administration of section 504
 
 
 [7]
 We note that the Congressional response to the Robinson decision described supra note 2 codified this aspect of the Court's decision. See Handicapped Children's Protection Act of 1986, Pub.L. No. 99-372, Sec. 3, 100 Stat. 796, 797 (codified at 20 U.S.C. Sec. 1415(f) (Supp. IV 1986)). Therefore, under the current version of 20 U.S.C. Sec. 1415, parents must exhaust all administrative remedies that are available under the EHA before they can seek judicial review of their child's educational program
 
 
 [8]
 We note that the administrative procedures of the EHA for reviewing parental complaints are largely designed to focus on the propriety of an individual handicapped child's educational program. This is not ordinarily the focus of an OCR investigation that may result from the receipt of a parental complaint. Thus, the OCR has noted that:
 It is not the intention of the Department, except in extraordinary circumstances, to review the result of individual placement and other educational decisions, so long as the school district complies with the "process" requirements of this subpart (concerning identification and location, evaluation, and due process procedures). However, the Department will place a high priority on investigating cases which may involve exclusion of a child from the education system or a pattern or practice of discriminatory placements or education.
 
 
 [34]
 C.F.R. pt. 104 app. A, at 492-93 (1988). Such forms of discrimination against the handicapped may escape detection under other regulatory provisions
 
 
 [9]
 We note that such termination cannot take place until thirty days after the Secretary reports to Congress that such a termination has been ordered. See 42 U.S.C. Sec. 2000d-1 (1982); 34 C.F.R. Sec. 100.8(c) (1988)
 
 
 [10]
 Jurisdiction in this suit was based on 28 U.S.C. Sec. 1331 (1982), as a suit arising under the laws of the United States
 
 
 [11]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit, including Unit B, handed down prior to October 1, 1981
 
 
 [12]
 Our decision in Deltona Corp. v. Alexander, 682 F.2d 888 (11th Cir.1982), cited the decisions in Marshall and Shawnee Coal with approval, thus giving implicit support to our approach in this case. See id. at 893. We note, of course, that the standard we adopt in this case acts only as a general guide as to when a court should exercise its discretion to excuse a litigant challenging an agency's jurisdiction from exhausting the available administrative remedies
 
 
 [13]
 Appellants also argue that the regulations implementing section 504 require affirmative action on the part of the state, and thus are outside the scope of authority granted by section 504. See, e.g., Southeastern Community College v. Davis, 442 U.S. 397, 410-13, 99 S.Ct. 2361, 2369-70, 60 L.Ed.2d 980 (1979) (Section 504 does not require a state to devote extra resources to accommodate admission of hearing-impaired nursing candidate.). We do not believe cooperation with the OCR's investigatory efforts plainly constitutes "affirmative action" that is outside the scope of section 504
 
 
 [14]
 The OCR gives the following authority for the promulgation of its regulations implementing section 504:
 Sec. 504, Rehabilitation Act of 1973, Pub.L. 93-112, 87 Stat. 394 (29 U.S.C. 794); sec. 111(a), Rehabilitation Act Amendments of 1974, Pub.L. 93-516, 88 Stat. 1619 (29 U.S.C. 706); sec. 606, Education of the Handicapped Act (20 U.S.C. 1405), as amended by Pub.L. 94-142, 89 Stat. 795.
 
 
 [34]
 C.F.R. pt. 104, at 467 (1988). None of these provisions contains an unambiguous or explicit authorization for the regulations contained in 34 C.F.R. pt. 104
 
 
 [15]
 Although we note that section 2 of Executive Order No. 11,914 specifically authorizes the promulgation of regulations implementing section 504, the Department apparently does not view the Order as the source of its authority to promulgate those regulations. See authority for regulations cited supra note 14. Instead, the Department interprets the Order as imposing a duty to promulgate guidelines distinct from its own section 504 regulations. These guidelines would coordinate the implementation of non-discrimination regulations throughout all affected government programs. The Department noted, however, that its section 504 regulations would be the basis for those guidelines. See generally 42 Fed.Reg. 22,677 (1977)
 
 
 [16]
 In Robinson, the Supreme Court noted that:
 Regulations under Sec. 504 and the EHA were being formulated at the same time.... The Secretary of HEW and the Commissioner of Education emphasized the coordination of effort behind the two sets of regulations and the Department's intent that the Sec. 504 regulations be consistent with the requirements of the EHA.
 468 U.S. at 1017 n. 20, 104 S.Ct. at 3471 n. 20 (citations to the Federal Register omitted). Thus, the contemporaneous regulatory history supports the Department's current position that a coordinated enforcement scheme was anticipated.