Dr. Robert R. FREEMAN, in his official capacity as Superintendent of the DeKalb County School District, and DeKalb County School District, Petitioners,

v.

Lauro CAVAZOS, in his official capacity as Secretary of the United States Department of Education, United States Department of Education and Office of Civil Rights, Respondents.

In re Dr. Robert R. FREEMAN, in his official capacity as Superintendent of the DeKalb County School District, and the DeKalb County School District, Petitioners.

Nos. 90–8904, 90–8935.

United States Court of Appeals, Eleventh Circuit.

Jan. 29, 1991.

---

Charles L. Weatherly, Julie J. Jennings, Decatur, Ga., Carter G. Phillips, Sidley & Austin, Washington, D.C., for petitioners.

John R. Dunne, Jessica Dunsay Silver, Marie K. McElderry, U.S. Dept. of Justice, Washington, D.C., for respondents.

Before TJOFLAT, Chief Judge, FAY and BIRCH, Circuit Judges.

PER CURIAM:

In an emergency motion, the Dekalb County School District (Dekalb) requests us to stay administrative action taken by the Secretary of the Department of Education (the Secretary) or, alternatively, to grant a writ of mandamus, *see* Fed.R. App.P. 21(c), that would force the Secretary to suspend his action until judicial review is complete.

## I.

The facts underlying this dispute are relatively simple. Several parents of handicapped children in Dekalb County filed complaints with the Department of Education (the Department),[1] alleging that Dekalb refused to reimburse them for expenses incurred in securing private residential placement for their children.[2] The

---

1. The parties agreed to focus on a single representative complaint, and stipulated (before the presiding administrative officer) as follows:
   1. [The complaint] alleges that Respondent, Dekalb County School District, refused to reimburse the complainant parent for expenses incurred in connection with a private residential placement during the 1981–84 school years when the District was unable to provide an appropriate placement for the complainant. The complainant thus alleges a violation of Section 504 [of the Rehabilitation Act of 1973, Pub.L. No. 93–112, § 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. § 794 (1988)) ] Regulations found at 34 C.F.R. § 104.33(c)(3).

   2. [F]or the present purposes, it is assumed that the School District does not provide residential placements for non-handicapped students.
   3. To date, the School District has declined to provide data that [the Office of Civil Rights] needs to determine whether there has been a violation of the above-cited regulations.

2. School districts sometimes place handicapped children in residential educational facilities when the school districts cannot offer appropriate educational opportunities to them.

Department's Office of Civil Rights (the OCR) then initiated an investigation[3] concerning Dekalb's compliance with 34 C.F.R. § 104.33 (1990)—a regulation that requires a recipient of federal funds operating a public elementary or secondary education program to provide a "free appropriate public education" to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.[4] Dekalb, however, refused to allow the OCR to examine its records, and the OCR initiated an administrative compliance proceeding against it.

In 1989, while the administrative proceedings were pending, Dekalb asked the United States District Court for the Northern District of Georgia to declare the regulations in 34 C.F.R. pt. 104 (1990) invalid since the Secretary allegedly promulgated them without appropriate legislative authority.[5] Dekalb's petition was denied, however, because it did not exhaust all of its administrative remedies—nor did it come within one of the exceptions to the exhaustion requirement.[6] We affirmed the district court decision, holding that the case presented a complex statutory scheme involving section 504 of the Rehabilitation Act of 1973, Pub.L. No. 93–112, § 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. § 794 (1988)) [hereinafter section 504], and the Education of the Handicapped Act, Pub.L. No. 91–230, §§ 601–685, 84 Stat. 175 (1970) (codified as amended at 20 U.S.C. §§ 1400–1485 (1988)) (the EHA). Specifically, we noted that when the Secretary purported to act under section 504, his jurisdiction was not plainly lacking; thus Dekalb had to exhaust all avenues of administrative review before we would hear the case. *See Rogers v. Bennett*, 873 F.2d 1387, 1393–96 (11th Cir.1989).

On April 26, 1990, the administrative proceedings ultimately concluded in favor of the Department. The Secretary then terminated all federal funding to Dekalb in accordance with 42 U.S.C. § 2000d–1 (1988), and Dekalb sought a temporary restraining order and judicial review of that action in the United States District Court for the District of Columbia. That court denied the temporary restraining order because Dekalb had shown neither that it would suffer immediate irreparable harm if the stay was denied nor that it was likely to succeed on the merits of its case. *Freeman v. Cavazos*, No. 90–2175–LFO, 1990 WL 141483 (D.D.C. Sept. 20, 1990) (memorandum denying temporary restraining order). Subsequently, the district court determined that it did not have jurisdiction to review the administrative proceedings,[7] and

---

3. Sections 104.61 and 100.7 of the federal regulations authorize the Department of Education to conduct reviews of state and local educational institutions to assure compliance with the provisions of section 504 of the Rehabilitation Act. 34 C.F.R. §§ 104.61, 100.7 (1990).

4. This regulation was promulgated pursuant to section 504 of the Rehabilitation Act. Section 504 provides that

[n]o otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794 (1988).

5. The petitioners made a broad attack on the validity of the Department's regulations implementing the mandate of section 504, contending that Congress never authorized the Department to promulgate regulations under that section; they also argued that, even if Congress authorized the promulgation of regulations under section 504, the Secretary's investigation in this case required affirmative action, and thus was

outside the scope of his authority. *See Rogers v. Bennett*, 873 F.2d 1387, 1393–94 & n. 13 (11th Cir.1989).

6. We excuse a litigant's failure to exhaust administrative remedies if:

(1) there is clear evidence that exhaustion of administrative remedies will result in irreparable injury; (2) the agency's jurisdiction is plainly lacking; and (3) the agency's special expertise will be of no help on the question of its jurisdiction.

*Id.* at 1393 (quoting *Marshall v. Burlington N., Inc.*, 595 F.2d 511, 513 (9th Cir.1979)).

7. Most grant statutes administered by the Secretary that allow termination of funding incorporate by reference the judicial review provisions of the General Education Provision Act, 20 U.S.C. §§ 1221–1234i (1988). That Act provides, with one exception, for review of termination actions by "the United States Court of Appeals *for the circuit in which that recipient is located.*" 20 U.S.C. § 1234g(b) (1988) (emphasis added); *see Freeman v. Cavazos*, 1990 WL 157935 (D.D.C.1990) [No. 90–2175–LFO, Oct. 4, 1990].

it dismissed the case. *See Freeman v. Cavazos*, 1990 WL 157935 (D.D.C.1990) [No. 90–2175–LFO, Oct. 4, 1990]. Dekalb then filed this emergency petition.

## II.

■ We consider four factors in determining whether an emergency motion should be granted:

(i) the likelihood the moving party will prevail on the merits;

(ii) the prospect of irreparable injury to the moving party if relief is withheld;

(iii) the possibility of harm to other parties if relief is granted; and

(iv) the public interest.

11th Cir. R. 27–1(b)(1). Since the grant of an emergency motion is an exceptional remedy, Dekalb, to succeed on its petition, must demonstrate that the equities lie strongly in its favor. In the instant case, however, Dekalb clearly has not shown that it will face irreparable injury before this case can be decided on its merits. Thus, only if the other three factors weigh heavily in favor of granting Dekalb an emergency stay or writ of mandamus would we grant this petition. *Cf. Garcia–Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir.1986) (when movant seeks an emergency stay of a district court order, unless factors two, three, and four weigh heavily in favor of granting the stay, the movant must demonstrate "that the trial court below was clearly erroneous"). We find, however, that the other three factors are at most equivocal. Consequently, we deny Dekalb an emergency stay or a writ of mandamus, which would require the Secretary to stay the termination of Dekalb's federal funds.

## A.

■ Dekalb will not suffer irreparable harm if we refuse to grant its petition. In fact, it has already tested—and lost—this argument in the United States District Court for the District of Columbia. On September 6, 1990, after final agency review in this case, the Secretary, acting pursuant to 42 U.S.C. § 2000d–1, terminated the provision of federal funds to Dekalb. Dekalb then petitioned that district court for a temporary restraining order, arguing that the loss of federal funds would cause it irreparable harm.[8] That court held, however, that since the 1990–91 school year was already fully budgeted, the termination order would not have an immediate effect. A decision on the merits, the court held, might well be handed down before the end of that academic year, causing no disruption to Dekalb's existing programs. Further, the Secretary had stipulated that he would not disburse the funds elsewhere until judicial review was completed. Given these circumstances, Dekalb cannot argue that it will suffer immediate irreparable harm from the termination.

Dekalb now also contends that an Outreach Program (designed to educate parents about the merits of its magnet school programming) will be lost for the current school year if funding is not released. Under title IV of the Civil Rights Act of 1964—the source of the funds for the Outreach Program—only state educational agencies are authorized recipients of the funds. *See* 42 U.S.C. § 2000c–2 (1988); 34 C.F.R. pt. 271 (1990). State agencies use the grants to provide technical assistance to local educational agencies, but they may not supply money to the local agencies in the form of subgrants. Given this regulatory scheme, Dekalb does not suffer any loss of funds—it was never entitled to any in the first place.[9]

Dekalb next argues that its reputation is needlessly being tarnished by the ongoing litigation, specifically by the lack of public awareness that the dispute turns on wheth-

**8.** The test for granting a temporary restraining order is comparable to the test for granting an emergency writ. For the test used by the United States District Court for the District of Columbia in *Freeman*, see *Wagner v. Taylor*, 836 F.2d 566, 575 (D.C.Cir.1987) (to determine whether an injunction is appropriate, a court must balance (1) the likelihood of the plaintiff's success on the merits, (2) the threat of irreparable injury to the plaintiff in the absence of an injunction, (3) the possibility of substantial harm to other interested parties from a grant of injunctive relief, and (4) the interests of the public).

**9.** Dekalb potentially could lose direct technical assistance from the federal government. In the instant case, however, Dekalb only alleges injury from the termination of funds.

er the Secretary has authority to investigate the school district pursuant to the regulations promulgated under section 504. While, conceivably, some residents of Dekalb County believe that federal funds are being withheld from Dekalb based upon a *finding* of discrimination against handicapped persons rather than Dekalb's refusal to allow the Secretary to investigate *allegations* of discrimination, we believe that most of the persons residing in the school district are capable of understanding the nature of Dekalb's dispute with the Secretary. In addition, we believe that if Dekalb ultimately succeeds on the merits of its case, its reputation will suffer little or no permanent injury.

### B.

■ To justify the issuance of an emergency petition where the petitioner faces little, if any, immediate injury, the petitioner must demonstrate a very strong likelihood of success on the merits of his claim. In this case, however, Dekalb presents two difficult statutory/regulatory issues: (1) whether the Secretary has authority to investigate Dekalb pursuant to regulations promulgated under section 504; and (2)

whether the Secretary can terminate federal funding after final agency action but while judicial review is pending. Neither question clearly would be decided in Dekalb's favor.

### 1.

As we have noted, Dekalb refuses to allow the Secretary to investigate complaints he has received concerning the residential placement of handicapped students in Dekalb County. Dekalb claims that 34 C.F.R. § 104.33 (a regulation promulgated pursuant to section 504), which requires school districts to provide a "free appropriate public education" to handicapped students, imposes an affirmative obligation contrary to *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Dekalb claims that the EHA, not section 504, establishes this substantive right. Although we do not think that Dekalb's argument is frivolous, neither would it clearly prevail.[10]

While we acknowledge that the OCR may exceed its statutory authority if it strictly limits its investigation to whether a school district provides affirmative relief to handicapped students,[11] the investigation

---

**10.** We note that *Rogers* was decided prior to a stipulation, which acknowledged that the Secretary opened his investigation only after receiving complaints about residential placement. *See supra* note 1. Therefore, in *Rogers,* we were called upon to decide whether requiring a school district to submit to investigation by the Secretary was in itself affirmative action. Since that case only involved the question of whether the administrative exhaustion requirement was excused, we asked whether the Secretary's action was plainly outside the scope of his authority. *See supra* note 6 (whether the agency's jurisdiction was plainly lacking). We determined that it was not. 873 F.2d at 1393–94 n. 13.

**11.** The United States Supreme Court has ruled that section 504 only calls for the "evenhanded treatment of qualified handicapped persons" not "affirmative efforts to overcome the disabilities caused by handicaps." *Davis,* 442 U.S. at 410, 99 S.Ct. at 2369; *see also Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 640–41, 106 S.Ct. 2101, 2119–20, 90 L.Ed.2d 584 (1986); *Alexander v. Choate,* 469 U.S. 287, 304, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985); *Smith v. Robinson,* 468 U.S. 992, 1018, 104 S.Ct. 3457, 3471, 82 L.Ed.2d 746 (1984) ("[Section] 504 does not require affirmative action on behalf of handicapped persons, but only the absence of discrimination against those persons.").

Although the Supreme Court cases explicitly hold that section 504 cannot mandate affirmative action, it is unclear exactly how far the Secretary can go in requiring the modification of existing programs before he oversteps his authority. The Court in *Davis* notes, for example, that

the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons [will not] always ... be clear. It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program. Technological advances can be expected to enhance opportunities to rehabilitate the handicapped or otherwise to qualify them for some useful employment. Such advances also may enable attainment of these goals *without imposing undue financial and administrative burdens upon the State. Thus, situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory. Identification of those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped continues to be an important responsibility of [the Department of Health, Education, and Welfare].*

sought here may be broader; it may encompass an examination of potential discrimination. In other words, although the complaint that initiated the Secretary's investigation involves residential placement of handicapped students, this does not necessarily mean that the investigation will concentrate solely on that subject matter. Rather, the Secretary may decide to launch a general investigation to determine whether Dekalb discriminates against handicapped students. Given the possible breadth of the Secretary's investigation, we cannot say that he clearly exceeded his authority under section 504.[12]

Even if, however, the Secretary limited the scope of his investigation to examining whether Dekalb should reimburse the complainants for the residential placement of their children, we do not believe that such an investigation clearly would be beyond his authority. After a recipient of federal funds takes some remedial steps, it is difficult to determine whether mandating further steps is affirmative action or simply an antidote for discriminatory conduct, i.e., a reasonable modification of an existing program.[13] In fact, a possible scenario is that the recipient of federal funds provides special services—perhaps even residential placement—for blind students, but refuses to provide such services, or comparable services, for deaf students. When the recipient of federal funds currently provides no special services for the handicapped, it might be considered affirmative action to compel the recipient to provide such services. It is unclear, however, that this is true once the recipient has made some effort to assist persons with particular types of handicaps. Section 504 may or may not

cover discrimination among various groups of handicapped persons, *compare Plummer v. Branstad*, 731 F.2d 574, 578 (8th Cir.1984) (severity of a handicap can itself be a handicap) *and Doe v. Colautti*, 592 F.2d 704, 708–10 (3d Cir.1979) (rejecting argument that discrimination between the mentally ill and physically ill contravenes section 504) *with Colin K. v. Schmidt*, 715 F.2d 1, 9 (1st Cir.1983) ("we have serious doubts whether Congress intended § 504 to provide plaintiffs with a claim for discrimination vis-a-vis other handicapped individuals") *and Clark v. Cohen*, 613 F.Supp. 684, 693–94 (E.D.Pa.1985) (no viable action under section 504 where plaintiff seeks to prove discrimination among similarly situated handicapped individuals provided differing benefits, but there would be a cause of action if plaintiff alleged that she faced discrimination because she was "mildly retarded as opposed to severely or borderline retarded"), *aff'd*, 794 F.2d 79 (3d Cir.), *cert. denied*, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986) *and William S. v. Gill*, 536 F.Supp. 505, 511 (N.D.Ill.1982) (need for special services was solely a result of the severity of plaintiff's handicap)—the answer is not apparent, but we cannot state that it *clearly* does not.

### 2.

Dekalb also seeks a writ of mandamus that would force the Secretary to suspend the termination of federal funds to Dekalb until judicial review is complete, in accordance with 20 U.S.C. § 1234g(a) (1988). We do not believe that Dekalb has demonstrated that it undoubtedly will prevail on the merits of this claim either.

---

*Davis*, 442 U.S. at 412–13, 99 S.Ct. at 2370 (emphasis added). This language suggests that the Secretary, in promulgating regulations under section 504, should be allowed some leeway in determining when a modification of existing programs is not substantial or unreasonable (i.e., the regulations do no more than require the same attention to individualized needs for handicapped as for non-handicapped children) and therefore is mandated by section 504. If, however, the Secretary does cross the boundary between anti-discrimination and affirmative action when he promulgates regulations, then the regulations will be unenforceable, at least to the extent that they exceed his authority.

12. If the Secretary, after investigating the complaints, issues an order requiring Dekalb to reimburse parents for the expenses they incur in providing private residential placement for their children, then Dekalb could challenge this order on the ground that it required Dekalb to take affirmative action. We do not mean to imply, however, that Dekalb would succeed on its claim, *see infra*, merely that such a case clearly would present the issue Dekalb now seeks to raise.

13. *See supra* note 11.

Section 504 is enforced in accordance with the "remedies, procedures, and rights" of title VI. 29 U.S.C. § 794a(a)(2) (1988). Section 603 of title VI, 42 U.S.C. § 2000d–2 (1988), provides that agency action terminating federal funding "shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds." To determine the appropriate judicial review provisions for the termination order in this case, we must find a statute that provides for judicial review of termination orders similar to the one the Secretary made here and that statute must govern terminations on non-civil rights grounds. *See* 110 Cong.Rec. 7060–61 (1964) (remarks of Senator Pastore). Since 20 U.S.C. § 1234d (1988) describes the procedure for termination of assistance under all but one of the grant statutes at issue here, the applicable judicial review provision is 20 U.S.C. § 1234g, a section of the General Education Provisions Act, 20 U.S.C. §§ 1221–1234i (1988) (the GEPA).

Section 1234g provides:

**(a) Recipients entitled to judicial review; stay of action by Secretary**

Any recipient of funds under an applicable program that would be adversely affected by a final agency action under section 1234a, 1234d, or 1234e of this title ... shall be entitled to judicial review of such action in accordance with the provisions of this section. The Secretary may not take any action on the basis of a final agency action until judicial review is completed.

**(b) Petition for review; filing of record**

A recipient that desires judicial review of an action described in subsection (a) of this section shall, within 60 days of that action, file with the United States Court of Appeals for the circuit in which that recipient is located, a petition for review of such action. A copy of the petition shall be transmitted by the clerk of the court to the Secretary. The Secretary shall file in the court the record of the proceedings on which the action was based....

**(c) Findings of fact**

The findings of fact by the Office, if supported by substantial evidence, shall be conclusive; but the court, for good cause shown, may remand the case to the Office to take further evidence, and the Office may make new or modified findings of fact and may modify its previous action, and shall certify to the court the record of the further proceedings. Such new or modified findings of fact shall likewise be conclusive if supported by substantial evidence.

**(d) Scope of review; review by Supreme Court**

The court shall have jurisdiction to affirm the action of the Office or the Secretary or to set it aside, in whole or in part. The judgment of the court shall be subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

While at first blush section 1234g(a) appears to impose a non-discretionary duty on the Secretary—requiring him to suspend any administrative action while judicial review is pending—this is not clear after a careful examination of the statutory framework. In particular, we note that the legislative history of title VI may indicate that a termination order can be imposed after final agency action. The Senate, for example, rejected an amendment to title VI that would have stayed administrative action while judicial review was pending, i.e., it would have had the same effect as section 1234g(a). 110 Cong.Rec. 14,192–93 (1964). Although section 1234g(a) was added to the GEPA by the Augustus F. Hawkins–Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988, Pub.L. No. 100–297, § 3501, 102 Stat. 130, 356, the legislative history of those amendments does not reflect an intent to make a major change in *title VI* law. Thus, it is at least a possible inference that only subsections 1234g(b)–(d)—and not subsection 1234g(a)—govern judicial review of terminations under section 504.[14] This position

---

**14.** Section 1234g(a) thus may not be considered a judicial review provision for purposes of title VI (although it certainly determines which provisions of the *GEPA* are subject to judicial review under 1234g and prohibits the Secretary from taking administrative action *under them* pending judicial review). Instead, section 602 of title VI, 42 U.S.C. § 2000d–1, would deter-

is bolstered by the Secretary's ability to defer federal financial assistance to school districts even during the course of administrative proceedings, if he abides by a strict administrative time frame. *See* 42 U.S.C. § 2000d–5 (1988); 20 U.S.C. § 1232i(b) (1988). An absolute administrative stay after the completion of administrative proceedings would appear to be illogical, given the possibility of deferral during the course of those proceedings.

### C.

We thus cannot accept the contention that Dekalb clearly will prevail on the merits of its case; the public interest and the potential harm to the Secretary and his enforcement scheme also counsel our abstention. Consequently, this emergency motion for a stay of the Secretary's action is

DENIED.

mine when the Secretary can terminate funding for a violation of section 504.